# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | CIVIL ACTION NO. 1:16-CV-2521 |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **ERIC ADAIR,** | : | |
| Defendant | : | |

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | CIVIL ACTION NO. 1:16-CV-2522 |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **DOUG JOHNSON,** | : | |
| Defendant | : | |

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | CIVIL ACTION NO. 1:16-CV-2523 |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **WILLIAM KRAMER,** | : | |
| Defendant | : | |

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | **CIVIL ACTION NO. 1:16-CV-2524** |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **JEFF LAWTON,** | : | |
| Defendant | : | |

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | **CIVIL ACTION NO. 1:16-CV-2525** |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **MICHAEL PERRI,** | : | |
| Defendant | : | |

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | **CIVIL ACTION NO. 1:16-CV-2526** |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **DANIEL SCHILKE,** | : | |
| Defendant | : | |

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.,** | : | **CIVIL ACTION NO. 1:16-CV-2527** |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **KEVIN SLUSARZ,** | : | |
| Defendant | : | |

**MEMORANDUM**[1]

Defendants move the court to exclude the report and testimony of plaintiff's proposed expert witness, Dr. Chris Rauwendaal. The court will grant in part and deny in part defendants' motion.

**I.     Factual Background & Procedural History**

Graham Engineering Corporation ("Graham") is a Pennsylvania corporation that offers design and development expertise for extruders. Defendants are seven former employees who left Graham's employ between December 2015 and April 2016 as the company relocated from Rhode Island to Pennsylvania. Defendants subsequently started US Extruders, a competing company in the extrusion business.

Graham commenced the instant actions on December 21, 2016, alleging contract breach, trade secret misappropriation, and related state-law tort claims against defendants. Following discovery, both parties filed motions for partial summary judgment. The court issued a memorandum and order disposing of those motions on February 10, 2021. Graham's remaining claims include breach of contract and misappropriation of trade secrets. Defendants' remaining

---

[1] This memorandum addresses motions filed across several dockets, with all lawsuits filed by the same plaintiff (Graham), but against different individual defendants: 1:16-CV-2521 (Adair), 1:16-CV-2522 (Johnson), 1:16-CV-2523 (Kramer), 1:16-CV-2524 (Lawton), 1:16-CV-2525 (Perri), 1:16-CV-2526 (Schilke), and 1:16-CV-2527 (Slusarz). The court prepared a single omnibus memorandum and order in the interest of judicial economy. Unless otherwise stated, all docket citations refer to the first action, 1:16-CV-2521 (Adair).

counterclaim involves damages for Graham's violation of the Stored Communications Act, 18 U.S.C. § 2701.

Graham retained the services of Dr. Chris Rauwendaal in connection with this litigation. (See Doc. 212-3). Dr. Rauwendaal holds postgraduate and doctorate degrees in mechanical engineering, has 45 years of experience in the polymer extrusion and compounding field, has published 200 papers and seven books on extrusion topics, and has appeared as a guest lecturer and keynote speaker at universities and extrusion conferences. (See id. at 4-5, 49-63). Graham obtained a report from Dr. Rauwendaal in September 2019, and a reiteration of his conclusions in response to defendants' expert in December 2019. (See id. at 2; Doc. 212-5). Dr. Rauwendaal was also deposed in January 2020. (See Doc. 212-2 at 4).

Dr. Rauwendaal's report contains background information on the extrusion industry and the parties to this litigation. (See Doc. 212-3 at 6-10). It sets out his opinions regarding the trade secret or confidential status of some information Graham accuses defendants of taking from the company, and his estimate of the competitive value of this information. (See id. at 6-22). Dr. Rauwendaal concludes that "80% of the documents [d]efendants took or still have in their possession are trade secret information" and that "[t]he remaining 20% . . . are confidential." (See id. at 13). Dr. Rauwendaal opines on the advantage of possessing certain templates, calculates the hours needed to reproduce engineering drawings, offers an estimate of damage caused by defendants' alleged possession of pricing information, and compares the price differences in certain Graham and US Extruder proposals. (See id. at 11-22, 35-38). His report contains information regarding Graham's

relationship with ProSystems, and states that ProSystems' termination of the relationship disadvantaged Graham due to Graham's reliance on ProSystems' control panel. (See id. at 22-25). Dr. Rauwendaal also generally opines on the time and labor costs of a starting up an extrusion company. (See id. at 25-26).

Defendants filed a motion *in limine* seeking to exclude Dr. Rauwendaal's report and preclude him from testifying. (See Doc. 208). Graham opposes defendants' motion. (See Doc. 222). The motion is fully briefed and ripe for disposition.

## II.     Legal Standard

Admissibility of expert testimony is governed by Federal Rule of Evidence 702. See FED. R. EVID. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993). Trial courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is . . . reliable." Daubert, 509 U.S. at 589. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit Court of Appeals has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider *ex rel.* Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)

5

(citation omitted). Rule 702 embraces a "liberal policy of admissibility," pursuant to which it is preferable to admit any evidence that may assist the trier of fact. Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

### III. Discussion

Defendants attack Dr. Rauwendaal's expert report from all sides of the Rule 702 analysis. Defendants claim that Dr. Rauwendaal is "not qualified to reach his opinion[s]," that his opinions "are not reliable," and that his opinions "would not assist the trier of fact." (See Doc. 209 at 16, 19, 20). We address each of defendants' arguments *seriatim*.

#### A. Qualifications

An expert witness must be qualified to testify as such by possessing "specialized expertise." Schneider, 320 F.3d at 404. The requisite expertise can include "a broad range of knowledge, skills, and training." Id. (quoting *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994)). Such expertise can also be "practical" as well as "academic." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (citation omitted). Our court of appeals has emphasized that this first requirement should be interpreted "liberally," and permits "generalized qualifications" rather than "overly rigorous requirements of expertise." *In re* Paoli, 35 F.3d at 741.

The instant litigation concerns two competing extrusion manufacturers. Dr. Rauwendaal has worked in the extrusion industry for over four decades, possesses multiple engineering degrees, publishes regularly on extrusion topics, and guest

lectures on extrusion. (See Doc. 213-3 at 39-65). Defendants' argument that Dr. Rauwendaal is not an expert in the "sub-specialty" of extrusion contract negotiation is unavailing. See Schneider, 320 F.3d at 406-07. We conclude that Dr. Rauwendaal possesses the requisite "generalized qualifications" to provide opinions on the extrusion industry related to his experience as an engineer and consultant in that realm. See In re Paoli, 35 F.3d at 741.

### B.    Reliability

Expert testimony is "reliable" when it is based upon sound methodology and technique. In re Paoli, 35 F.3d at 742. The touchstone is whether the expert's methodology is "sufficiently reliable so that it will aid the jury in reaching accurate results." Id. at 744 (internal quotation marks omitted). An expert opinion cannot be based on "subjective belief and unsupported speculation." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 834 (3d Cir. 2020). However, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." In re Paoli, 35 F.3d at 744. Our court of appeals has explained that "[a]s long as an expert's scientific testimony rests upon 'good grounds, based on what is known,'" it should be admitted. United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) (citation omitted); Kannankeril, 128 F.3d at 806 ("Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.").

The Third Circuit has enumerated several factors to guide the court's reliability inquiry:

7

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48 (citing *In re* Paoli, 35 F.3d at 742 n. 8). This list of factors is a "convenient starting point," but is "neither exhaustive nor applicable in every case." Kannankeril, 128 F.3d at 806-07. United States Supreme Court precedent emphasizes that "relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). Accordingly, the Rule 702 reliability inquiry is "a flexible one," and the factors considered must be applicable to the facts of the case. Id. (quoting Daubert, 509 U.S. at 594).

### 1. *Importance of Information Allegedly Taken*

Dr. Rauwendaal first provides opinions on the importance of information that Graham alleges defendants took from the company during their departures. (See Doc. 212-3 at 11-14). He lists items that he claims are "typically considered to be trade secrets" within the extrusion industry and opines that "the overwhelming majority" of the documents allegedly take by defendants are trade secrets or confidential information. (See id. at 11). After naming certain files and data that defendants purportedly misappropriated, Dr. Rauwendaal claims repeatedly that "his experience" leads him to conclude these documents are trade secrets. (See id.

8

at 11, 12, 13). The report offers little other information to support these legal conclusions, and Dr. Rauwendaal presents no methodology, testing, or personal experience in assessing trade secret status. He also provides no analysis or review specific to Graham's protection of these documents. Cf. Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 2d 612, 620 (E.D. Pa. 2009) (trade secret information "must be an actual secret of peculiar importance to the business and constitute competitive value to the owner"). In light of these clear deficiencies, the court finds that this section of Dr. Rauwendaal's report is not reliable under Third Circuit precedent. Cf. Pineda, 520 F.3d at 248.

### 2. *Value of Information Allegedly Taken & Comparison of Graham and US Extruders Pricing*

Dr. Rauwendaal provides an opinion regarding the value of different documents allegedly taken by defendants. (See Doc. 212-3 at 14-22). He divides these documents into three categories: administrative documents, drawings, and pricing information. (See id.) Another section compares a sampling of Graham pricing to US Extruder pricing. (See id. at 35-37).

Dr. Rauwendaal's administrative documents section focuses on a "Visual Procedures" directory and two templates allegedly taken by defendants. (See id. at 15-16). He extrapolates to conclude that possessing templates like the Visual Procedures directory would "allow a new company to hit the ground running," and opines that a competitor to Graham would gain an advantage through such documents. (See id. at 16-17). While his opinion does not contain methodology or empirical data, we consider it the generalized type of conclusion that comes from

9

Dr. Rauwendaal's "personal knowledge or experience" in this specialized industry. Cf. Kumho Tire, 526 U.S. at 150. We therefore conclude that the administrative documents section of Dr. Rauwendaal's report is reliable under Third Circuit precedent. Cf. Pineda, 520 F.3d at 248.

Dr. Rauwendaal also offers opinions on engineering drawings that defendants allegedly misappropriated. He categorizes these drawings by type, describes his methodology for reviewing them, offers a baseline calculation for the time it would take to produce each category of drawings, and concludes with a mathematical calculation of the number of engineering hours needed to create the drawings defendants allegedly misappropriated. (See Doc. 212-3 at 17-20). Dr. Rauwendaal testified that he has produced "hundreds and hundreds of drawings" over his career as an engineer. (See Doc. 212-2 at 14-16). He added that he works with designers and engineers regularly. (See id. at 16). While defendants protest that Dr. Rauwendaal did not conduct a statistical analysis by engaging a series of engineers to recreate certain engineer drawings, (see Doc. 209 at 14), such exacting methodology is not required, see Pineda, 520 F.3d at 248 (noting that technical experts such as engineers can rely on "relevant literature, evidence of industry practice, and product design"). Given Dr. Rauwendaal's experience and understanding of such "industry practice," we find that his opinions regarding the drawings are reliable under Rule 702. See id.

Dr. Rauwendaal's discussion of pricing, however, provides conclusions without explanation. (See Doc. 212-3 at 20-22). After noting Graham's expected profit margin for a handful of customers allegedly lost to US Extruders, Dr.

10

Rauwendaal states "it is reasonable to assume that Company Y, the company that has access to a competitor's pricing information, will obtain 50% of the business that Company A would have secured had its competitor not had its pricing information." (See id. at 22). He then uses 50 percent to calculate profits Graham allegedly lost due to defendants' purported use of pricing information. (See id.) Dr. Rauwendaal offers nothing other than his *ipse dixit* to substantiate this "50 percent" probability. Indeed, when questioned about this number during his deposition, he conceded he had not even analyzed the different proposals that had been submitted to the customers Graham lost to US Extruders; he simply compared the machinery and requested prices. (See Doc. 212-2 at 35-36). Dr. Rauwendaal did not know who else bid on the projects. (See id. at 37). Nor could he estimate how many projects US Extruders would have secured *without* the allegedly misappropriated pricing information. (See id. at 42-43). He merely repeated that the 50 percent estimate was "reasonable" based on his experience. (See id. at 41-43).

Dr. Rauwendaal also compared pricing information from several Graham and US Extruders proposals. (See Doc. 212-3 at 35-37). He stated in his report that manufacturers in the United States are "typically within 10% of their competitors' pricing." (See id. at 37). He therefore considered US Extruder pricing atypical, and opined that "repeatedly undercutting [Graham's] pricing" allowed US Extruders to win bids and "gain a market share." (See id.) During his deposition, however, Dr. Rauwendaal conceded he lacked personal experience in negotiating sales or purchases of extruders. (See Doc. 212-2 at 29-31, 46-48). He merely provides

11

technical consulting during the process regarding machine specifications. (See id. at 31). He further conceded that customers may share the price quotes they receive to garner a better offer from the manufacturer, and that it was "quite common" for a younger business to have aggressive pricing. (See id. at 45, 56). Dr. Rauwendaal failed to cite industry literature or other objective data for his "10 percent" opinion and based the number only on his experience providing technical advice within the industry. (See id. at 37).

From our analysis of the report and deposition testimony, we do not find Dr. Rauwendaal's opinions on contract pricing or the probability of bid-winning to be reliable. Dr. Rauwendaal furnishes *technical* expertise in these transactions. He does not sell extruders, and he did not comprehensively compare the proposals submitted to support his conclusions on the win/loss rate for Graham. While we do not doubt Dr. Rauwendaal's technical expertise, he provides no objective data for his percentages, and does not cite or refer to professional literature or any other accepted industry standard for his calculations. For these reasons, we conclude that the opinions in the pricing sections of Dr. Rauwendaal's report are not reliable under Third Circuit precedent. Cf. Pineda, 520 F.3d at 248.

### 3. *Information on ProSystems & US Extruders Early Success*

Dr. Rauwendaal's report includes two sections which appear to provide generalized background information. First, in a short section titled "ProSystems," he discusses the importance of a control system that ProSystems produces in the extrusion industry, and lists the current "control packages" US Extruders offers from ProSystems. (See Doc. 212-3 at 22-24). After supplying a timeline of Graham's

relationship with ProSystems, he concludes that ProSystems' termination of that relationship in 2017 put Graham "at a disadvantage." (See id. at 23-24). Second, in another section Dr. Rauwendaal considers US Extruders' entrance into the industry. (See id. at 25). He notes that starting up a manufacturing business means "a large amount of time and money," and contrasts this with the defendants' deposition assertions that they did not spend much time on activities related to the company in 2016 and early 2017. (See id. at 25-26). According to Dr. Rauwendaal, defendants should have been "quite busy" in the months prior to opening. (See id. at 26).

Dr. Rauwendaal's generalized opinions in both of these sections can be gleaned from 40-plus years in extrusion manufacturing. We therefore conclude Dr. Rauwendaal's opinions rely on "good grounds" evinced by his decades of experience in this industry, and he can reliably testify on the importance of control systems in the extrusion industry, the effects of losing a long-time vendor, and the general costs and effort involved in beginning an extrusion manufacturing company. See Mitchell, 365 F.3d at 244.

**C.     Fit**

Expert testimony must be "sufficiently tied to the facts of the case, so that it 'fits' the dispute and will assist the trier of fact." UGI Sunbury, 949 F.3d at 832 (internal quotation marks omitted). The concept of fit "is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. at 835 (quoting Daubert, 509 U.S. at 591). Specialized or scientific knowledge may still be excluded if it is not specialized knowledge "for the

13

purposes of the case." Id. (quoting In re Paoli, 35 F.3d at 743). Whether an expert's testimony fits the dispute is not an exacting standard, but "is higher than bare relevance." United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting In re Paoli, 35 F.3d at 745).

We confine our fit analysis to the portions of Dr. Rauwendaal's opinion that meet the standards for reliability: his opinions regarding the administrative documents and drawings allegedly misappropriated by defendants, on the importance of controls systems in an extrusion manufacturing business, and on the startup costs to run an extrusion manufacturing company. The factual issues remaining in this case involve purported breaches of contracts, liability and damages issues on trade secret misappropriation, and damages concerning violation of the Stored Communications Act. (See generally Docs. 227, 228). We have already concluded that the drawings allegedly misappropriated by defendants constitute trade secret information. (See Doc. 227 at 37-38). We therefore conclude that Dr. Rauwendaal's opinions concerning the complexity and length of time needed to recreate these drawings may assist the trier of fact. We further conclude that the importance of administrative documents, a controls system, and the costs associated with beginning an extrusion company may also be helpful to the trier of fact on the issues that remain regarding alleged breach of contract by the defendants.

## IV.   Conclusion

The court will grant in part and deny in part defendants' motion (Doc. 208) *in*

*limine*.  An appropriate order shall issue.

/S/ C<span style="font-variant:small-caps">hristopher</span> C. C<span style="font-variant:small-caps">onner</span>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 15, 2021